

# NUMBER 13-12-00240-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

GEORGE GARZA A/K/A
GEORGE OSBORNE,                                                    Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

### On appeal from the 319th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Valdez**

By one issue, appellant, George Garza a/k/a George Osborne, appeals the trial

court's denial of his motion to suppress. We reverse and remand.

# I.  BACKGROUND

Appellant was driving his vehicle in Corpus Christi, Texas when he was stopped for a traffic violation by Officer Allen Dial, who is assigned as a K-9 Officer with the police department.  After Officer Dial's K-9 alerted him that the appellant's vehicle contained drugs, ten grams of cocaine were located in appellant's vehicle.  Appellant was arrested and charged with possession of cocaine in an amount of four grams or more but less than 200 grams.  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (West 2010).

During the pendency of his case, appellant filed several motions including a motion to dismiss for want of a speedy trial, a motion for *Brady* material, a motion to list witnesses and request criminal histories, a motion to disclose expert witnesses, and a motion to suppress the evidence.[1]  The trial court granted appellant's motion for *Brady* material on December 1, 2011.  It is clear from the record that the trial court also granted appellant's motions to list witnesses and disclose expert witnesses.[2]

On February 16, 2012, the trial court held a hearing on appellant's motion to suppress.  The State presented testimony from Officer Dial and a video of appellant's encounter with Officer Dial.  Appellant presented testimony from Jerry Potter, an expert on narcotic detector dogs.  After both sides rested, the trial court stated that it would rule on the motion to suppress after viewing the video admitted into evidence.  The trial court indicated that it would consider the motion to suppress and the cases cited therein when

---

[1] Appellant did not request a hearing on his motion to dismiss and no hearing was held.  There is no ruling on that motion in the record.

[2] The signed order dated December 1, 2011, is located in the Clerk's record; however, the trial court did not indicate within the order by checking off whether it was granting or denying the motion.  It is clear from the record that the trial court granted appellant's motions, because the trial court documented in its docket sheet that it had granted appellant's "motions" on December 1, 2011.

determining whether to grant or deny the motion. The trial court did not sign an order denying appellant's motion to suppress.

On March 22, 2012, pursuant to a plea bargain agreement with the State, appellant pleaded guilty to possession of cocaine in an amount of four grams or more but less than 200 grams, a second-degree felony enhanced to a first-degree felony upon appellant's plea of "true" to a prior felony conviction. The trial court followed the plea agreement and sentenced appellant to seven years' incarceration. On March 22, 2012, the trial court certified appellant's right to appeal "matters raised by written motion filed and ruled on before trial and not withdrawn or waived." This appeal followed.

## II. THE SUPPRESSION HEARING

Officer Dial testified that he is assigned as a K-9 officer with the Corpus Christi Police Department and that his primary duties include being a K-9 handler. Officer Dial stated that he is "not out on the streets anymore making patrol calls and things of that nature." Officer Dial's dog is named Kallen and is a Dutch Shepherd. According to Officer Dial, Kallen has received "extensive" training and is certified by the National Narcotic Detector Dog Association to detect marijuana, cocaine, methamphetamine, and heroin. Officer Dial thought that Kallen received her last certification in June 2011.

On January 26, 2011, Officer Dial received a call from narcotics officers regarding an investigation they were conducting of a vehicle. The narcotics officers told Officer Dial that they suspected that the vehicle "might be . . . . doing some kind of narcotics transactions." Officer Dial "was given information about where this vehicle was traveling," and he "got behind the vehicle." On cross-examination, Officer Dial acknowledged that his report did not mention that narcotics agents had called him and

3

asked for assistance in making the stop of appellant's vehicle. However, Officer Dial explained that at the time, he did not believe that it was important for him to document such facts within the report.

Officer Dial testified that he observed that the driver of the vehicle he was told to pursue changed lanes without turning on his turn signal. Officer Dial stated that he initiated a traffic stop of the vehicle because appellant committed the offense of "not signaling [continuously for] 100 feet of a lane change." On cross-examination, Officer Dial explained that it was his intention to stop the vehicle, which was suspected of carrying narcotics, after he observed a traffic violation. Officer Dial stated, "I'm not denying, sir, that it's a pretext stop. It was a pretext stop." Officer Dial denied that anyone indicated that they wanted to search appellant's vehicle.[3]

Officer Dial testified that appellant told him that his name was "George Garza." On cross-examination, Officer Dial agreed with defense counsel that he initially asked appellant "about his residence and where he lives, where he's been, where he's going, where he's coming from." When asked if those questions had anything to do with the purpose of the traffic stop—investigating the alleged illegal lane change—Officer Dial replied, "No." Officer Dial agreed that after appellant answered these questions, he told appellant that he was not going to issue a ticket for the alleged traffic violation.

Officer Dial did not agree with defense counsel that the purpose of the traffic stop ended at this point in the encounter. Officer Dial testified that it is common practice for an officer conducting a traffic stop to make sure that the person's information is "correct," that the person does not have a warrant, and that everything on the driver's

---

[3] On cross-examination, Officer Dial testified that he did not document within his report that two unmarked narcotics units arrived at the location of the stop during his detention of appellant.

4

license is correct and at this point of the encounter, he had not done so. Officer Dial testified that he then went back to his vehicle and ran the name he was given, which came back "clear." On re-direct examination, Officer Dial testified that he "runs" a person's information through his "information channels" even when he does not intend to give out a ticket. Officer Dial does this in order to "make sure that [the person does not] have any kind of warrant, to make sure [the] driver's licenses are clear and valid." Officer Dial agreed with defense counsel that the dispatcher told him there were no warrants for the person he stopped.[4] On direct-examination, Officer Dial stated that when he "ran" that name and date of birth, he discovered that "George Garza" did not have a criminal history.

While in his vehicle after hearing from dispatch that appellant was "clear," Officer Dial received a phone call from one of the narcotics agents. The video recorded Officer Dial informing the agent that appellant did not have a criminal history and asking whether "George Garza" is their guy. Officer Dial agreed with defense counsel that at this point of the encounter, he had no reason to suspect that "George Garza" was not appellant's legal name.

On cross-examination, Officer Dial testified that once he discovered that there were no outstanding warrants, he went back to "the passenger's side first, and [he] asked [appellant] a few more questions." When defense counsel asked if that had anything to do with the purpose of the traffic stop, Officer Dial responded, "It does, sir, because I think I'm still looking at the insurance papers and making sure that the

---

[4] The video recording of the encounter shows that after the dispatcher informs Officer Dial that there are no warrants, Officer Dial does not allow appellant to leave the scene, stays in his vehicle for a few minutes, and takes a call from a narcotics agent.

insurance—the V.I.N. that's on the insurance papers matches up with the V.I.N. on the vehicle."[5]

The video shows that when Officer Dial went back to appellant's vehicle, he asked questions regarding the purchase of the vehicle and the paperwork. Officer Dial asked appellant if he had purchased his vehicle "about" one week prior to the stop. Appellant responded that he had. Officer Dial then asked appellant if the insurance is for the vehicle he is driving and if the vehicle identification number matches. Appellant responded, "Yes." Officer Dial then appears to look at the stickers on the vehicle's windshield. At this point, Officer Dial asked appellant to step out of the vehicle; appellant complied. Officer Dial testified that he believed that he had reasonable suspicion at this point of the encounter due to appellant's nervousness and "the totality of the circumstances."

When asked to explain his reason for considering appellant's alleged nervousness suspicious, Officer Dial stated that appellant's nervousness "appeared to be above" the nervousness demonstrated by individuals who are simply nervous about being stopped by a police officer. Officer Dial explained, "He was even more nervous. He was looking from side to side. He appeared a little more nervous than the normal person that you stop on a traffic violation." Officer Dial claimed that appellant's nervous state "indicated" to him that appellant could have been hiding something. When asked if there were any other things that caused him to think that appellant was nervous or apprehensive, Detective Dial said:

---

[5] Although it is not included in the record whether the vehicle identification numbers matched, the video shows Officer Dial returning the paperwork to appellant.

6

He was—it looked like when I was back at my unit running—running him on the information channel, it looked like he was going above and beyond—like hanging his arm out the window trying to act like he was calm when he really wasn't. I had told him already that I was not going to issue him a citation.

Usually if all a person is worried about is getting a ticket, if you let them know, hey, I'm not going to write you a citation, usually that will calm them down. And it didn't seem to be calming him down that much.

Officer Dial stated that at "some of the classes" he has attended he was trained to observe an elevated pulse. Officer Dial explained that appellant's pulse appeared to be elevated and "appeared to be a little fast, faster than normal. A resting pulse is anywhere between 60 and 70 beats per minute. His appeared to be way over 100. He appeared to be—have a fast pulse." Defense counsel asked Officer Dial to explain his ability to ascertain a person's pulse. Officer Dial stated, "if their pulse rate is high, you can see the artery in their neck pulsing. . . . Every time the heart beats, it pulses . . ." Officer Dial testified that appellant's pulse rate was not the only reason he investigated further.

In addition, Officer Dial claimed that he observed that when he initially pulled appellant over, appellant "reached" forward. Officer Dial "couldn't tell if it was up or down . . . . And [Officer Dial] was a little nervous about this too." Officer Dial stated that he thought that appellant was "either hiding a weapon or possibly contraband." On cross-examination, Officer Dial testified that he did not know whether appellant had been reaching for a weapon and admitted that he did not document in his report that he saw appellant reach for something in his vehicle. Officer Dial stated that he did however put in his report "see video for further details."[6] The video does not show a

---

[6] On cross-examination, Officer Dial testified that he could not recall when he generated a police report regarding his encounter with appellant and that he wrote the report at his "earliest convenience."

7

clear view of appellant's movement in his vehicle. We are unable to determine from viewing the video whether appellant did in fact reach forward.

As appellant exited his vehicle, Officer Dial told appellant "I'm not gonna write you a ticket or anything like that." After appellant exited the vehicle, Officer Dial asked appellant if he had any weapons, knives, or guns. Appellant replied that he did not. Officer Dial performed a pat down of appellant, and appellant did not have any weapons. Officer Dial stated that he "pat[ted appellant] down" because "he had on real loose clothing and because [he] saw [appellant] reach when [he] first pulled [appellant] over." Officer Dial agreed with defense counsel that appellant was now being detained and was not free to leave.

Officer Dial testified on direct-examination, that appellant then admitted that he had previously been to prison.[7] When asked, "Okay. When the person that you stopped told you that he had actually been to prison before, what did that tell you," Officer Dial replied, "Well, it—common sense would tell you that something is wrong, either they're lying about their name or the dispatcher was wrong, one or the other." Officer Dial did not "run [appellant's] name as George Osborne" at the scene.

Officer Dial then again asked appellant if he had any weapons. Appellant said he did not. Officer Dial asked appellant if he had any drugs, and appellant said no. At this point Officer Dial asked appellant if he was putting a weapon in "the dash" when he was

Officer Dial agreed that he has been trained on how to properly prepare a police report, but he did not agree that police reports should be written within a day or two of the event. Officer Dial agreed that his report regarding his encounter with appellant was made "at a time when the events were fresh in [his] memory." Officer Dial testified that his encounter with appellant occurred "[a]lmost 13 months" prior to the suppression hearing. Officer Dial agreed that he followed his training in generating police reports when he wrote the report in this case and "assume[d]" that one could rely on the report.

[7] As explained below, Officer Dial asked appellant about his criminal history after the purpose of the stop ended; thus, Officer Dial could not have relied on this information in order to continue his detention of appellant.

8

stopped. Appellant said no. Officer Dial asked if appellant was getting his paperwork. Appellant responded that he was getting his paperwork and again stated that he did not have any weapons hidden. Officer Dial then asked appellant for consent to search the vehicle, and appellant refused. Officer Dial testified that he told appellant to sit on the curb, which appellant did, and he then got Kallen out of his vehicle. Officer Dial then led Kallen around the perimeter of appellant's vehicle one time. Kallen did not alert the first time around. When Officer Dial led Kallen for a second time around the vehicle, Kallen alerted at the driver's side door.

Officer Dial explained that Kallen is trained to sit down when she has detected the scent of the drugs she is certified to locate. Officer Dial stated that in this case, Kallen sat down next to the driver's side door of the vehicle when she alerted him of the scent of the cocaine, and subsequently, cocaine was discovered there. Officer Dial denied that he did anything to cue Kallen to sit down when she alerted in this case. According to Officer Dial, he has worked with Kallen prior to his encounter with appellant, and she has never failed her certification tests.

### III. PRESERVATION

As a preliminary matter, we must address the State's assertion that appellant has not preserved his issue for our review. Specifically, the State argues that the trial court did not explicitly rule on appellant's motion to suppress.

The trial court in this case certified that although this is a plea bargain case, "matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and [appellant] has the right of appeal." The State argues that although the trial court signed the above-mentioned certification, there is nothing in the record

9

indicating that the trial court intended to make a ruling on the motion to suppress before appellant pleaded guilty.

In order to preserve an issue for appeal, the appellant must obtain a ruling either explicitly or implicitly. *See* TEX. R. APP. P. 33.1(a). Here, it is undisputed that the trial court made no explicit ruling on appellant's motion to suppress. Appellant refers this Court to the trial court's certification of his right to appeal and his plea hearing where he asserts the trial court acknowledged its denial of his motion to suppress. At that hearing the following occurred:

| The Court: | .... And then you do have the notice that because you entered into a plea agreement, you do not have the right to appeal, except for rulings made on pretrial matters. |
|---|---|
| [Trial Counsel]: | That is correct, Your Honor, and we do have a motion filed, if I may address the Court very quickly. |
| The Court: | Sure. |
| [Trial Counsel]: | We did file a motion, notice of appeal, rather pursuant to 25.02(A–28), permitting appeals on pretrial matters. With all due respect, with the decision of the Court we do feel that it's a somewhat meritorious to appeal. |
| The Court: | Sure. |
| [Trial Counsel]: | That's why it's not [a] frivolous claim. We're asking the Court to consider giving [appellant]—we did file a motion to set reasonable bail pending appeal. According to the Code, 44.04(C), [appellant] may be entitled to a bond if the Court chooses to give one until any finality is given—on—or handed down from the Court of Appeals on his case. |
| The Court: | Okay. |

The trial court then set appellant's bail at $20,000.

10

When appellant entered his guilty plea, the trial court had already granted a motion for *Brady* material, a motion to list witnesses and request criminal histories, and a motion to disclose expert witnesses. The trial court did not explicitly rule upon appellant's motion to dismiss and motion to suppress. The State asserts that it is possible that when the trial court signed its certification of appellant's right to appeal, it was referencing appellant's motion to dismiss.

However, appellant never requested and the trial court never held a hearing on appellant's motion to dismiss due to a speedy trial violation. Furthermore, the trial court never indicated that it would consider or that it had considered appellant's motion to dismiss. In contrast regarding the motion to suppress the following occurred: (1) appellant filed with the trial court a memorandum in support of his motion to suppress; (2) appellant requested a hearing; (3) the trial court held a hearing on the motion to suppress where two witnesses testified; (4) at the plea hearing, the trial court recognized that appellant had the right to appeal rulings made on pretrial motions; (5) appellant's trial counsel stated that the motion filed with the trial court was meritorious; (6) the trial court acknowledged trial counsel's belief that the issue was meritorious; (7) appellant requested bond pending the appeal of a meritorious motion; and (8) the trial court granted appellant's request for bond pending his appeal. Finally, at the end of the suppression hearing, the trial court stated that closing argument was not required from either side and stated that it would consider the motion to suppress and the cases cited therein when determining whether to grant or deny the motion. The trial court also granted appellant's post-conviction request for bond pending the appeal of a motion that was meritorious. It appears that by conducting a hearing on the motion to suppress,

11

suggesting that it would rule on the motion to suppress after considering the case law cited by appellant and his brief and without argument, granting post-conviction bond, and signing the certification of appellant's right to appeal, the trial court recognized that it had implicitly denied appellant's motion to suppress. Although the State counters that the trial court could have been referring to appellant's motion to dismiss when it signed its certification of appellant's right to appeal, there is nothing in the record to substantiate such a claim. Therefore, based on the record before us, we conclude that the trial court implicitly denied appellant's motion to suppress. Accordingly, we cannot conclude that appellant did not preserve error in this case.

### IV. STANDING

The State also asserts that appellant lacks standing to challenge the search of the vehicle he was driving because appellant presented no evidence that he owned or had an interest in the vehicle. Citing *Flores v. State*, 871 S.W.2d 714, 720 (Tex. Crim. App. 1993), the State argues that "the defendant must offer evidence to show that he had an expectation of privacy in that vehicle, in the form of some interest in, or at least the right to use, the vehicle." In *Flores*, the State presented evidence that the car that had been searched was owned by the defendant's mother, and the defendant did not provide any evidence that he had an interest in the vehicle or that he had a right to use the vehicle. *See id.* The court of appeals concluded that appellant had failed to show that he had a legitimate expectation of privacy in the vehicle that was searched. *See id.*

In this case, the evidence presented showed that appellant was the driver of the vehicle, appellant was the sole occupant of the vehicle, and appellant bought the vehicle one week prior to his encounter with Officer Dial. Unlike the defendant in

12

*Flores*, there is no evidence that someone else was the registered owner of the vehicle appellant was driving. Therefore, we do not find *Flores* applicable to the fact scenario in this case. Accordingly, we conclude that appellant has shown that he had an interest in the vehicle; therefore, he had standing.

## V. INVESTIGATORY DETENTION

By his first issue, appellant contends that Officer Dial violated his Fourth Amendment rights by conducting an unlawful detention.[8] Specifically, appellant argues that he was detained after the purpose of the stop was completed. Appellant asserts that the scope of the traffic stop ended when Officer Dial ran his information, it was clear, and Officer Dial told appellant he would not be issuing a citation.

## A. Standard of Review

We review a trial court's ruling on a motion to suppress for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In reviewing a trial court's ruling on a motion to suppress evidence for an abuse of discretion, we use a bifurcated standard. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc) (citing *Guzman v. State*, 955 S.W.2d 85, 88 (Tex. Crim. App. 1997) (en banc)); *see also Urbina v. State*, No. 13-08-00562-CR, 2010 Tex. App. LEXIS 6728, **3–7 (Tex. App.— Corpus Christi Aug. 19, 2010, pet. ref'd) (mem. op., not designated for publication). We give almost total deference to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex.

---

[8] At the motion to suppress hearing, appellant's trial counsel stated that appellant was not challenging the validity of the initial stop. *See Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) ("The subjective intent or motivations of law enforcement officials is not taken into account when considering the totality of the circumstances.") (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Crim. App. 2007) (citing *Guzman*, 995 S.W.2d at 89). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 107 (Tex. Crim. App. 2006)); *Guzman*, 995 S.W.2d at 89.

In our review, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, as long as it is supported by the record. *Id.*

## B. Applicable Law

An investigative detention is a seizure for purposes of Fourth Amendment analysis. *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). To justify the detention, the state must provide evidence showing sufficient facts to prove that reasonable suspicion existed that a particular person had engaged in criminal activity. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001).

A temporary investigative detention is reasonable, and therefore constitutional, if (1) the officer's actions were justified at the detention's inception, and (2) the detention was reasonably related in scope to the circumstances that justified the initial interference. *Terry v. Ohio*, 392 U.S. 1, 18–19 (1968). The officer must be able to point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Id.*; *Davis v. State*, 947 S.W.2d 240, 242 (Tex. Crim. App. 1997). An investigative stop must be temporary and must not last longer than necessary to accomplish the purpose of the investigation. *Davis*, 947 S.W.2d at 243 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

14

An officer's decision to stop a motorist is reasonable if the officer has probable cause to believe that a traffic violation has occurred. *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000). Regarding the scope of a temporary traffic stop, the court of criminal appeals explained the following:

> On a routine traffic stop, police officers may request certain information from a driver, such as a driver's license and car registration, and may conduct a computer check on that information. It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved. It is at this point that the detention must end and the driver must be permitted to leave.

> [Moreover] neither the Fourth Amendment nor the Supreme Court dictate that an officer making a *Terry* traffic stop must investigate the situation in a particular order. A traffic stop may involve both an investigation into the specific suspected criminal activity and a routine check of the driver's license and car registration. Only if a license check "unduly prolongs" the detention is the officer's action unreasonable under the circumstances.

*Kothe v. State*, 152 S.W.3d 54, 65 (Tex. Crim. App. 2004).

An officer's mere questioning of the detained individual concerning matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of the detention if the officer is waiting for the result of a computer warrant check. *Haas v. State*, 172 S.W.3d 42, 50 (Tex. App.— Waco 2005, pet. ref'd) (citing *United States v. Sharpe*, 470 U.S. 675, 687 (1985)). Once the investigation of the conduct that was the subject of the traffic stop is concluded, an officer may continue his detention of the individual only if the officer, on the basis of observations and information, develops reasonable suspicion that the individual has engaged, was engaging, or was soon to engage in criminal conduct. *Le Blanc v. State*,

15

138 S.W.3d 603, 605 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Woods v. State*, 956 S.W.2d 33, 35, 38 (Tex. Crim. App. 1997)).

An appellate court reviews the reasonableness of a detention using an objective standard by determining whether the facts available to the officer at the moment of detention would warrant a person of reasonable caution to believe that the detention was appropriate. *Terry*, 392 U.S. at 21–22; *Davis*, 947 S.W.2d at 243. "The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly." *Davis*, 947 S.W.2d at 245 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). A prolonged interrogation exceeding the scope of the initial stop may cease to be an investigative stop. *See Haas*, 172 S.W.3d at 50. There is, however, no rigid time limitation. *Herrera v. State*, 80 S.W.3d 283, 288 (Tex. App.—Texarkana 2002, pet. ref'd).

## C. Analysis

At the suppression hearing, Officer Dial admitted that he targeted appellant's vehicle after receiving a call from narcotics agents stating that appellant's vehicle "might" be involved in "some kind of narcotics transactions." At this point, Officer Dial did not have any reasonable suspicion or probable cause to stop appellant, so he waited until he observed a traffic violation. Officer Dial testified that he observed appellant make an illegal lane change. Officer Dial turned on his overhead lights, and appellant stopped at a parking lot.

Once appellant stopped, Officer Dial approached the vehicle and asked where appellant was going and asked for his license and proof of insurance. Officer Dial

16

asked appellant when he acquired the vehicle because the vehicle had a temporary buyer's license plate. Appellant stated that he did not receive any paperwork from the seller. Officer Dial did not state that he acquired reasonable suspicion to further the appellant's detention at this point. The State argues that Officer Dial obtained reasonable suspicion concerning the legitimacy of the vehicle's sale when appellant stated that he had recently purchased the vehicle but had no documentation from the seller regarding the purchase. We disagree that the lack of paperwork regarding the purchase of a vehicle creates a reasonable suspicion that a crime has been committed. Based on the totality of the circumstances, we conclude that Officer Dial did not have a reasonable suspicion at this point that appellant had engaged in criminal activity, that appellant was engaging in criminal activity, or that appellant would be engaged in criminal activity.

As stated above, however, an officer does not violate the Fourth Amendment's prohibition against unreasonable seizures if during the scope of an investigative detention he conducts a computer check regarding the detainee's driver's license and whether the car is stolen and insured. *Kothe*, 152 S.W.3d at 65. "It is only after this computer check is completed, and the officer knows that this driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the traffic-stop investigation is fully resolved." *Id.*

Here, Officer Dial told appellant that he would not be issuing a ticket for the traffic violation; Officer Dial then returned to his unit to run a check on appellant. However, once Officer Dial completed his check and discovered that appellant was "clear," Officer Dial did not end the investigation of the initial stop. *See Kothe*, 152 S.W.3d at 65.

17

Instead, Officer Dial, after speaking to a narcotics agent on the phone, returned to appellant's vehicle and continued detaining him to investigate whether the vehicle identification number of appellant's vehicle matched the vehicle identification number on the insurance. During this investigation, Officer Dial asked appellant to exit his vehicle. Officer Dial testified at the suppression hearing that he did so because he observed that appellant had "reached" for something when he initially stopped. After appellant exited his vehicle, he told Officer Dial that he did have a criminal history.[9]

Officer Dial initially stopped appellant for a traffic violation, therefore, once the purpose of that stop ended, Officer Dial needed to point to specific articulable facts, which taken together with rational inferences from those facts, reasonably warranted the appellant's further detention. *Terry*, 392 U.S. at 18–19; *Davis*, 947 S.W.2d at 242. We conclude that once Officer Dial told appellant he would not be issuing a ticket and completed his check on appellant, the purpose of the stop ended. *See Kothe*, 152 S.W.3d at 65. Therefore, Officer Dial was required to support his further detention of appellant on the basis that he had a reasonable suspicion that appellant was engaging in criminal activity.

Officer Dial stated that he reasonably believed that appellant was engaging in criminal activity because appellant was nervous beyond the nervousness exhibited by others in the same situation and appellant "reached" forward when Officer Dial initially stopped appellant. Although Officer Dial testified that he observed appellant "reach" forward, none of Officer Dial's actions support his bald assertion that he was "a little

---

[9] The State argues that at this point, Officer Dial had reasonable suspicion to detain appellant because the criminal history check came back "clear." Because we conclude, as explained below, that the scope of the stop ended before appellant made this statement, it could not have formed the basis of the detention in this case.

18

nervous about" it or that he believed that appellant was hiding a weapon or contraband. In fact, Officer Dial did not ask appellant to exit his vehicle when he saw appellant "reach" forward, and Officer Dial proceeded with the stop as if he had not observed appellant's alleged movement.[10] Furthermore, although Officer Dial testified that he thought appellant "was either hiding a weapon or possibly contraband," Officer Dial did not articulate any specific facts that would lead a person to reasonably conclude that the act of "reach[ing]" forward indicates that a person has a weapon or contraband. Next, although Officer Dial claimed that appellant was more nervous than other motorists in the same situation, the court of criminal appeals has concluded that nervousness alone does not rise to a level of reasonable suspicion that a crime has been, is being, or will be committed. *See Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012). Therefore, we conclude that the facts articulated by Officer Dial in this case would not warrant a person of reasonable caution to believe that the further detention of appellant was reasonable. *See Terry*, 392 U.S. at 21–22; *Davis*, 947 S.W.2d at 243.

Thus, the trial court abused its discretion when it denied appellant's motion to suppress the evidence. Accordingly, we sustain appellant's first issue.

---

[10] Officer Dial did not ask appellant about his movement until after Officer Dial had improperly detained appellant. At that time, appellant explained to Officer Dial that he was reaching toward the visor to acquire his paperwork. Officer Dial appears to have accepted appellant's explanation because Officer Dial did not immediately search appellant's vehicle for a weapon or contraband. *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (explaining that because "roadside encounters between police and suspects are especially hazardous," officers may also perform a protective search of "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden" and that such a search is permissible "if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons"). Instead, Officer Dial requested appellant's consent to search the vehicle. Therefore, we cannot conclude that the trial court could have found that appellant's movement was suspicious because such a finding is not supported by the record.

19

## VII. CONCLUSION

We reverse the trial court's denial of appellant's motion to suppress and remand for further proceedings consistent with this opinion.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
3rd day of July, 2013.